IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) ) | Civ. No. 09-0507-E-BLW MEMORANDUM DECISION |
| v. | ) ) | AND ORDER |
| BUREAU OF LAND MANAGEMENT, et al., | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**INTRODUCTION**

The Court has before it a motion for TRO against the Bureau of Land

Management (BLM), originally filed by plaintiff WWP in *WWP v. U.S. Forest*

*Service*, *07-151-E-BLW* and set for argument on October 6, 2009.  Because the

BLM was not a named defendant in that case, WWP also filed a motion to amend

its complaint to add the agency as a defendant.

The Court denied the motion to amend, requiring WWP to file a new action

against the BLM.  Because WWP was seeking emergency relief, the Court

maintained the October 6, 2009, hearing date, and deemed filed in the new action

**Memorandum Decision & Order – page 1**

the TRO motion and all associated materials that had been filed in the earlier action.

The Court heard oral argument on the TRO on October 6, 2009, and took the motion under advisement.  For the reasons expressed below, the Court will grant the motion.

## STANDARD OF REVIEW

A plaintiff seeking injunctive relief must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365 (2008).  A "possibility" of irreparable harm is insufficient; irreparable injury must be "likely" in the absence of an injunction.  *Id.*  A preliminary injunction is "an extraordinary remedy never awarded as of right."  *Id.* at p. 376. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Id.* at p. 376.

## LITIGATION BACKGROUND

WWP seeks to enjoin the BLM from allowing grazing on the Partridge Creek allotment.  The BLM has authorized the Carlson Livestock Company to

graze up to 833 domestic sheep on the allotment beginning October 15th, just a few days away.  WWP argues that the domestic sheep will transmit a deadly disease to a nearby herd of bighorn sheep.

**Carlson Livestock**

Guy Carlson, the President of Carlson Livestock Company, resides in Riggins and has been grazing the Partridge Creek allotment since 1937.  *See Carlson Declaration at p. 2, ¶ 3.*  He owns 37% of the land encompassed by the allotment, while the BLM owns 59%, and the Idaho Department of Lands 4%.  *See Unsworth Declaration at p. 3, ¶ 8.*

Carlson's current permit was originally issued in 2003, after the BLM conducted a Standards and Guidelines Determination showing that the allotment was meeting all eight of the Standards.  *See Determination (docket no. 167-6).* Each year thereafter, Carlson had to obtain an authorization from the BLM that contained terms and conditions governing grazing on the Partridge Creek allotment.  For the 2009 grazing season, Carlson's annual authorization was issued in February of 2009.  *See Authorization (docket no. 151-7).*

The Partridge Creek allotment is located on the south side of the Salmon River, ten miles east of Riggins.  Across the river to the north lies the Nez Perce National Forest; to the south lies the Payette National Forest.  The Partridge Creek

allotment is an island of BLM land (along with state and private land) sandwiched between Forest Service land.

In past grazing seasons, Carlson rotated his sheep through the Partridge Creek allotment and into allotments on the National Forest lands to the north and the south. His typical rotation pattern is set forth in the table below:

| Time | Carlson Sheep Location |
|---|---|
| October 15 to November 30 | Partridge Creek allotment (BLM land) |
| November 15 to March 1 | Allison-Berg allotment (Nez Perce National Forest) |
| March 1 to April 11 | Private land |
| April 11 to July 15 | Partridge Creek allotment |
| July 15 to October 7 | Payette National Forest allotments |
| October 7 to October 15 | Trail sheep to Partridge Creek |

Recently, however, Carlson has not been able to follow this rotation pattern because the Forest Service has closed the Allison-Berg allotment entirely and closed 60% of the allotments he used in the Payette National Forest. Those allotments were near bighorn herds, and the Forest Service decided to close them while it prepared a Supplemental Environmental Impact Statement (SEIS) to examine the relationship between domestic sheep grazing and bighorn die-offs.

Carlson states that the closure of the Partridge Creek allotment, on top of the closures of these Forest Service allotments, would mean that he could not continue

to operate in a "profitable manner." *See Carlson Declaration at p. 3, ¶ 5.* If he is barred from grazing during the 47 days from October 15 to November 30, he would "incur $3,000 in trucking costs to move the sheep off the Riggins area to Emmett for private pasturage plus an additional $5,481 associated with labor and feed on private ground in Emmett." *Id.* He states that he would also continue to use his private ground "on both sides of the river for domestic sheep use for as long as possible." *Id.*

**<u>Bighorn Status</u>**

The Forest Service closures of allotments to the north and south of the Partridge Creek allotment were prompted by dramatic declines in populations of bighorn sheep throughout this Salmon River drainage area. *See Lawrence Declaration* at p. 3, ¶ 5. In the area including the Partridge Creek allotment, bighorn numbers have dropped 70% over the past 20 years. *See Idaho Department of Fish & Game Strategy at p. 2 (docket no. 167-8).*

The Forest Service assembled a team of experts that prepared a Risk Analysis concluding that the scientific literature demonstrates that "clinically healthy bighorn sheep have developed pneumonia and died within days to weeks following contact with clinically healthy domestic sheep." *See Risk Analysis at p. 3.* They found a broad consensus that "domestic sheep and bighorn sheep must be

**Memorandum Decision & Order – page 5**

kept separated in order to maintain healthy bighorn populations." *Id.*

The BLM relied on the Forest Service's Risk Analysis in preparing a Proposed Resource Management Plan EIS (PRMP/EIS) for lands including the Partridge Creek allotment. *See Cooper Declaration at p. 5, ¶ 15.* After reviewing the PRMP/EIS, the BLM's Director upheld it except as it applied to 4 allotments, including the Partridge Creek allotment. As to those four allotments, the Director was persuaded by the protests of the Nez Perce Tribe and environmental groups to direct that a further analysis be done through an SEIS on the impacts of grazing on bighorns. *See BLM Letter (docket no. 167-4); Exhibit 23 to Declaration of Lawrence at p. 3.*

Although the BLM relied on the Forest Service's Risk Analysis, the BLM came to a different conclusion on whether to allow grazing while the SEIS was being prepared – the BLM decided to continue to permit grazing under the prior management plans that were developed more than 25 years ago. *See BLM Letter to Carlson (docket no. 167-1).* The SEIS will take about two years to prepare.

**<u>Strategy For Reducing Risk</u>**

To set the conditions on which grazing would continue during this interim period, the BLM worked together with Carlson, the Idaho Department of Agriculture, the Idaho Department of Fish and Game (IDFG), and the Idaho

**Memorandum Decision & Order – page 6**

Department of Lands (IDL).  Together, they entered into an agreement entitled

"Strategy for Reducing Risk of Contact between Bighorn Sheep and Domestic

Sheep in the Salmon River Area." This Strategy – signed in April of 2009 –

provides generally that BLM and the IDL will monitor grazing on the Partridge

Creek allotment, and when they observe bighorns within a mile of domestic sheep

and presenting a risk of contact, the sheep will be moved immediately to avoid

contact.  *See Strategy at p. 7.*

**<u>Best Management Practices</u>**

Shortly after the Strategy was signed by all parties, the Idaho Legislature

passed a law requiring the IDFG to cooperatively develop best management

practices with grazing permittees on federal and/or state allotments.  The statute

goes on to state that

> [u]pon commencement of the implementation of [BMPs], the director [of
> IDFG] shall certify that the risk of disease transmission, if any, between
> bighorn and domestic sheep is acceptable for the viability of the bighorn
> sheep. The director's certification shall continue for as long as the best
> management practices are implemented. The director may also certify
> that the risk of disease transmission, if any, between bighorn and
> domestic sheep is acceptable for the viability of the bighorn sheep based
> upon a finding that other factors exist, including but not limited to
> previous exposure to pathogens that make separation between bighorn
> and domestic sheep unnecessary.

The IDFG entered into negotiations with Carlson to comply with this

statutory command to develop best management practices.  A team of IDFG

**Memorandum Decision & Order – page 7**

managers and biologists, along with IDFG's counsel, prepared a draft for Carlson's

consideration.  After some negotiation, the parties signed in August of 2009 an

agreement entitled "Best Management Practices for Separation Between Domestic

Sheep and Bighorn Sheep" [BMPs].  *See BMPs (docket no. 167-9).*  Like the

Strategy, the BMPs provide for monitoring of the allotment by BLM and state

officials.  Carlson agreed to use two herders, three guard dogs, and three herding

dogs, with each band of sheep.  If co-mingling occurs, Carlson may kill the

bighorn and notify the IDFG immediately.  *Id*. *at BMP #10.*

 But in one important respect, the BMPs are not as strict as the Strategy.

While the Strategy directed the immediate movement of sheep when bighorns were

observed within a mile and there was a risk of contact, the BMPs state merely that

officials from the BLM and IDFG must be notified – there is no provision for

immediate movement of the sheep.  *Id. at BMPs #4 & #10.*  The BMPs depend on

voluntary compliance – they are not part of the terms and conditions of Carlson's

permit and cannot be enforced by the BLM.

 At the conclusion of the BMPs is the "Director's Certification" required by

the statute once the BMPs are implemented.  While the statute directs the IDFG

Director to certify "that the risk of disease transmission, if any, between bighorn

and domestic sheep is acceptable for the viability of the bighorn sheep," the

**Memorandum Decision & Order – page 8**

Director in this case merely certified that the BMPs "provide for separation that reduces the risk from disease transmission between domestic sheep and bighorn sheep to an acceptable level based on other factors that exist consistent with Idaho Code § 36-106(e)(5)(E)." The phrase in the certification regarding "other factors that exist" was explained by IDFG's James Unsworth as referring to the "intermingled land management pattern of the Partridge Creek allotment as it related to achieving separation through implementation of the BMPs." *See Unsworth Declaration* at p. 4.

Thus, the Director here certified that the risk has been reduced to an acceptable level. Acceptable to who? Acceptable under what standard? These questions are not answered in either the certification or Unsworth's Declaration. Moreover, the certification does not track the statutory language. The statute says nothing about *reducing* a risk of disease transmission merely to some undefined *acceptable* level. Instead, the statute requires a certification that the *risk* of disease transmission "is acceptable *for the viability of the bighorn sheep*." *Id. at subsection (E) (emphasis added)*. There is no certification in this case that upon implementation of the BMPs, the risk of disease transmission will be acceptable for the viability of the bighorn sheep.

## Tribe's Analysis

Memorandum Decision & Order – page 9

The Nez Perce Tribe has conducted the most extensive scientific review of bighorns in this area, and set forth their findings in the Salmon River Bighorn Sheep Study.  It examined a 70-mile stretch of the Salmon River from Riggins east to Big Mallard Creek, an area that encompasses the Partridge Creek allotment.  The Tribe tracked radio-collared bighorns in this area to study their distribution and overlap with domestic sheep allotments.  *Id*. at p. 6, ¶ 10.

The Study showed that a group of 11 bighorn rams resides directly across the river from the Partridge Creek allotment.  *Id*. at p. 8, ¶ 15.  GPS data retrieved from one of the radio-collars showed that a ram identified as R14 crossed over the Salmon River into the Partridge Creek allotment on four different occasions.  *Id*. at p. 8, ¶ 16.  During the rut season (mid-October to mid-December), this ram traveled east along the Salmon River for over 25 miles, interacting with 4 of the 5 ewe groups in the study area.  *Id*.  This was typical of bighorns, who frequently interact with each other all along the 70-mile stretch of the study area.  Thus, a contagious disease would spread quickly over a large geographical area.  *Id*. at p. 9, ¶ 19.

Based on this Study, the Tribe's experts concluded that there was a "very high risk of contact and potential for disease transmission" on the Partridge Creek allotment, given that (1) bighorns were just across the river, (2) the river posed no

barrier to contact, (3) one bighorn was shown to have crossed over the river into the allotment, and (4) an infected bighorn may travel far up-river to spread the disease among the Salmon River drainage population, the last native population of bighorns in the State. *See Mack Declaration at p. 11, ¶ 23.* The Tribe's experts met with the BLM to convey these concerns prior to the BLM's decisions on the Partridge Creek allotment. *Id. at p. 8, ¶ 15.*

**<u>Evaluation of BMPs</u>**

The high risk of contact – and the lethal nature of the disease – led the Tribe's experts to conclude that BMPs would be ineffective. *Id. at p. 11, ¶ 23.* This opinion was shared by Victor Coggins, the District Wildlife Biologist for the Oregon Department of Fish and Wildlife. He has over 30 years of experience with the bighorns in Hells Canyon, which has terrain similar to that of the Salmon River drainage. *See Fifth Declaration of Scoggins at p. 1, ¶ 3.* He pointed out that similar BMPs have been ineffective in Oregon because domestic sheep stray from their band and contact the bighorns. While these BMPs require two herders, and dogs, they cannot keep a lookout over each of the more than 600 sheep, especially in this steep, rugged terrain. Two strays survived for four or five months in the nearby Smith Mountain allotment, wandering in bighorn habitat during that time. *Id. at p. 3, ¶ 11.*

**Memorandum Decision & Order – page 11**

The Forest Service reached similar conclusions in evaluating BMPs for the

Allison-Berg allotment, across the river from the Partridge Creek allotment.  *See*

*Evaluation (docket no. 153-4).*  After reviewing similar BMPs, the Forest Service

concluded that their implementation would render the risk of disease transmission

"moderately high," because it was unlikely that the BMPs would be successful in

keeping the sheep separate from the bighorns.[1]  *Id. at p. 2.*

## ANALYSIS

In past decisions, the Court reviewed the scientific literature concerning the

transmission of disease between domestic sheep and bighorns, concluding that

"domestic sheep stand accused by the overwhelming majority of experts" of

transmitting a form of lethal pneumonia to the bighorns.  *See WWP v. U.S. Forest*

*Service*, *07-151-E-BLW, Memorandum Decision at p. 8 (docket no. 54).*  The Court

also found that "[p]ast attempts to separate bighorns from domestic sheep appear to

have been unsuccessful, and there is a powerful natural attraction between the

animals."  *Id.*  In reviewing the group of bighorns on the Allison-Berg allotment,

---

[1] The Court is aware that the danger of interaction between bighorn and domestic sheep
may be  substantially greater on the Allison-Berg allotment than on the Partridge Creek
allotment.  This is suggested by telemetry data and visual sitings which indicate that bighorns
frequent the Allison-Berg allotment with far greater regularity.   It is possible that a detailed
scientific analysis would have concluded that this difference justified the BLM in reaching a
different conclusion for Partridge Creek allotment than did the Forest Service for the Allison-
Berg allotment.   However, as discussed below, no such scientific analysis was undertaken by the
BLM before it decided to authorize grazing while the SEIS was being completed.

just across the river from the Partridge Creek allotment, the Court found that they "are a native species, and thus the loss of that herd would be particularly devastating to the genetic diversity of bighorns." *Id, Memorandum Decision at p. 7 (docket no. 103).*

The unrebutted evidence in this case shows that (1) bighorns congregate just across the river, (2) the river is no barrier, (3) sheep stray and seek out the bighorns, (4) the steep terrain makes it very difficult to monitor stray sheep or mingling bighorns, (5) stray sheep can wander in bighorn territory for months, and (6) bighorns can travel long distances up and down the Salmon River drainage to visit other bighorn herds.

Evaluating these factors under the injunction standard set forth above, the Court finds first that the infection of bighorns across the river would constitute irreparable harm, as it is highly likely that they could infect not only their immediate companions but herds far up-river in the drainage. The loss of the only remaining native bighorns would be devastating.

In weighing the equities, the Court considers the economic harm that Carlson will suffer. As discussed, he will incur expenses of about $9,000 if the allotment is closed, and will not be able to operate in a "profitable manner." He does not say he will be forced out of business but merely that he will be forced to

consider other options like more intensive grazing of his private ground or real estate development of the river-front property.  In comparison to the loss of the bighorns described above, the equities weigh clearly in favor of an injunction.  Moreover, an injunction would be in the public interest.

With regard to the likelihood of success, WWP alleges that it is likely to prevail on its NEPA claim.  NEPA and its regulations prohibit agencies from making any irreversible or irretrievable commitment of resources before an EIS is completed so that the agency does not do damage before even considering the effects of its action.  *See Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000).

Irreversible damage is possible here.  Well before the SEIS is completed many months from now, bighorns could become infected and roam far up-river in the Salmon River drainage, infecting the other native bighorns along the way causing large-scale losses.

In explaining his decision to keep the Partridge Creek allotment open for grazing, BLM District Manager Gary Cooper noted that the bighorns are not listed under the Endangered Species Act, and have not been identified as a sensitive species by the BLM.  *See Cooper Declaration at p. 9, ¶ 42(f).*  He does not discuss, however, whether he considered (1) the fact that the bighorns in the Salmon River drainage are the last remaining native population of bighorn sheep in Idaho, and

(2) the threat this poses to genetic diversity if these bighorns are killed by pneumonia transmitted by domestic sheep.

Cooper also cites as a factor in keeping the allotment open the certification issued by the IDFG under Idaho Code § 36-106(e)(5)(E).  He does not discuss, however, the certification's failure to track the statutory language – as discussed above – because it is silent on whether the risk of disease transmission is acceptable for the viability of the bighorns.

Even a certification that tracked the statute would be meaningless, however. While the statutory language requires that the Director certify that the risk is acceptable for bighorn viability if BMPs are implemented, the statute does not actually require the BMPs to meet that standard.  Indeed, the statute contains no standards for the BMPs.  Hence, the statute allows the Director to negotiate whatever BMPs he can with the permit holder – without regard for their effect on bighorns – and then when the permit holder implements those BMPs, the Director is compelled to certify that the risk is acceptable for bighorn viability.

The Court will assume the best of all parties that had a hand in drafting this statute and presume that this result was not intended.  Certainly it is highly unlikely that the IDFG, which has a sterling reputation for integrity, would take advantage of this language to ignore bighorn survival.

**Memorandum Decision & Order – page 15**

Nevertheless, the mere fact of certification remains meaningless under the plain language of the statute.  The record must reveal that the IDFG and the BLM went further than the language of the statute and set in place BMPs that had some science behind them.  The present record – obviously thin on a motion for TRO – shows no supporting science for the BMPs.

All the evidence in the record – discussed above – indicates that BMPs are ineffective in the steep terrain of the Partridge Creek allotment.  The Forest Service found them ineffective on similar terrain just across the river.  There is no explanation by the IDFG or the BLM as to why they would be more effective on the Partridge Creek allotment.

For all these reasons, the Court finds that injunctive relief is warranted under the standard set forth in *Winter* discussed above.  The Court will therefore grant WWP's motion to enjoin grazing on the Partridge Creek allotment until such time as the Court can hold an evidentiary hearing.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for TRO filed in Civ. No. 07-151-E-BLW (docket no. 148) is deemed filed in this case and GRANTED and that grazing on the Partridge Creek allotment is enjoined.

**Memorandum Decision & Order – page 16**

IT IS FURTHER ORDERED, that the plaintiffs submit a bond in the sum of $9,000 pursuant to Rule 65(c).

IT IS FURTHER ORDERED, that this TRO shall last until an evidentiary hearing to be held on **November 2, 2009, at 9:00 a.m.** in the Federal Courthouse in Poctatello Idaho.



DATED:  **October 14, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order – page 17**